Citation Nr: 1443658 
Decision Date: 09/30/14 Archive Date: 10/06/14

DOCKET NO. 02-10 731 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to an increased rating for degenerative disc disease of the lumbar spine, currently evaluated as 20 percent disabling.

2. Entitlement to an initial evaluation in excess of 20 percent for cervical disc disease with headaches.

3. Entitlement to a compensable evaluation for phobic reaction to flying prior to May 22, 2009.

4. Entitlement to a rating in excess of 50 percent for phobic reaction to flying with posttraumatic stress disorder (PTSD) from May 22, 2009 to April 17, 2013 and entitlement to a rating in excess of 70 percent thereafter.

5. Entitlement to an initial compensable evaluation for hearing loss in the left ear.

6. Entitlement to a separate compensable rating for headaches associated with service-connected cervical disc disease.

7. Entitlement to individual unemployability (TDIU).


REPRESENTATION

Appellant represented by: Florida Department of Veterans Affairs


WITNESS AT HEARING ON APPEAL

Appellant


ATTORNEY FOR THE BOARD

Amanda Christensen, Associate Counsel


INTRODUCTION

The Veteran served on active duty from September 1962 to September 1982. 

This matter comes to the Board of Veterans' Appeals (Board) on appeal from an August 1999 decision of the Department of Veterans Affairs (VA) Regional Office (RO) that denied service connection for cervical disc disease, granted service connection for hearing loss in the left ear and assigned a noncompensable evaluation, increased the evaluation assigned for the Veteran's service-connected lumbar spine degenerative disc disease to 20 percent, and denied the claim for a compensable rating for phobic reaction to flying. By rating action dated May 2002, the RO granted service connection for cervical disc disease with headaches, and assigned a 20 percent evaluation. 

In a June 2011 rating decision, the RO assigned a 50 percent rating from May 22, 2009 for the Veteran's service-connected phobia with PTSD, and in a May 2014 rating decision, the RO assigned a 70 percent rating from April 17, 2013. 

In April 2006, October 2009, December 2011, and January 2014, the Board remanded the issues on appeal for additional development. The claim has since been returned to the Board for further appellate action. 

The Veteran was afforded a hearing before the undersigned Veterans Law Judge at the RO in August 2013. 

This appeal was processed using the Virtual VA and Veterans Benefits Management System (VBMS) paperless claims processing systems. Accordingly, any future consideration of this appellant's case should take into consideration the existence of these electronic records.

The issues of entitlement to an initial compensable rating for left ear hearing loss, a separate compensable rating for headaches associated with service-connected cervical disc disease, and TIDU being remanded are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.


FINDINGS OF FACT

1. The Veteran's degenerative disc disease of the lumbar spine has been manifest with pain and loss of range of motion that can be described as no more than moderate.

2. The Veteran's cervical disc disease has been manifest with pain and loss of range of motion that can be described as no more than moderate.

3. Prior to May 22, 2009 the Veteran's phobic reaction to flying has been manifest with symptoms including phobia of crowds and confined spaces, depression, and anxiety causing occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress.

4. From May 22, 2009 to April 17, 2013 the Veteran's phobic reaction to flying with PTSD has been manifest with symptoms including panic attacks, anxiety, depression, and poor sleep, causing occupational and social impairment with reduced reliability and productivity.

5. As of April 17, 2013 the Veteran's phobic reaction to flying with PTSD has been manifest with symptoms including panic attacks, anxiety, depression, and poor sleep, causing occupational and social impairment with deficiencies in most areas.


CONCLUSIONS OF LAW

1. The criteria for an evaluation in excess of 20 percent for degenerative disc disease of the lumbar spine have not been met. 38 U.S.C.A. § 1155, 5107 (West 2002); 38 C.F.R. §§ 3.321, 4.1, 4.40, 4.45, 4.71a, Diagnostic Code 5292 (2002), Diagnostic Codes 5235-5243 (2013).

2. The criteria for an evaluation in excess of 20 percent for cervical disc disease have not been met. 38 U.S.C.A. § 1155, 5107 (West 2002); 38 C.F.R. §§ 3.321, 4.1, 4.40, 4.45, 4.71a, Diagnostic Code 5290 (2002), Diagnostic Codes 5235-5243 (2013).

3. The criteria for an evaluation of 10 percent, but no higher, have been met for phobic reaction to flying prior to May 22, 2009. 38 U.S.C.A. § 1155, 5107 (West 2002); 38 C.F.R. §§ 3.321, 4.1, 4.120, Diagnostic Code 9411 (2013).

4. The criteria for an evaluation in excess of 50 percent for phobic reaction to flying with PTSD from May 22, 2009 to April 17, 2013 and in excess of 70 percent thereafter, have not been met. 38 U.S.C.A. § 1155, 5107 (West 2002); 38 C.F.R. §§ 3.321, 4.1, 4.120, Diagnostic Code 9411 (2013).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Disability evaluations are determined by evaluating the extent to which a Veteran's service-connected disability adversely affects his or her ability to function under the ordinary conditions of daily life, including employment, by comparing his or her symptomatology with the criteria set forth in the Schedule for Rating Disabilities. The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and the residual conditions in civilian occupations. Generally, the degree of disabilities specified are considered adequate to compensate for considerable loss of working time from exacerbation or illness proportionate to the severity of the several grades of disability. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. § 4.1 (2013). Separate diagnostic codes identify the various disabilities and the criteria for specific ratings. 

If two disability evaluations are potentially applicable, the higher evaluation will be assigned to the disability picture that more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2013). Any reasonable doubt regarding the degree of disability will be resolved in favor of the Veteran. 38 C.F.R. § 4.3 (2013). However, the evaluation of the same disability under various diagnoses, known as pyramiding, is to be avoided. 38 C.F.R. § 4.14 (2013).

Lumbar Spine
 
The Veteran is currently rated at 20 percent for degenerative disc disease of the lumbar spine under Diagnostic Code 5243.

During the pendency of this appeal, the schedule for rating disabilities of the spine was revised effective on September 23, 2002, and on September 26, 2003. See 67 Fed. Reg. 54349 (Aug. 22, 2002); 38 C.F.R. § 4.71a, Diagnostic Code 5293 (2003); see also 68 Fed. Reg. 51454 -51458 (Aug. 27, 2003) (codified at 38 C.F.R. § 4.71a, Diagnostic Codes 5235-5243 (2013)). 

The Board will evaluate the Veteran's claims under both the old criteria in the VA Schedule for Rating Disabilities and the current regulations in order to ascertain which version would accord him the highest rating. The effective date of any rating assigned under the revised scheduler criteria may not be earlier than the effective date of that change; the Board must apply only the earlier version of the regulation for the period prior to the effective date of change. VAOPGCPREC 3-2000; 38 U.S.C.A. § 5110(g) (West 2002) (where compensation is awarded pursuant to any Act or administrative issue, the effective date of such award or increase shall be fixed in accordance with the facts found but shall not be earlier than the effective date of the Act or administrative issue).

Prior to September 26, 2003, a 20 percent rating was warranted for moderate limitation of motion of the lumbar spine and a 40 percent rating was warranted for severe limitation of motion. 38 C.F.R. § 4.71a, Diagnostic Code 5292 (2002). 

The September 2003 regulation revisions set forth a General Rating Formula for Diseases and Injuries of the Spine, with or without symptoms such as pain (whether or not it radiates), stiffness, or aching in the area of the spine affected by residuals of injury or disease. As relevant to the lumbar spine, under the formula, a 20 percent evaluation is warranted when forward flexion of the thoracolumbar spine greater than 30 degrees, but not greater than 60 degrees; when the combined range of motion of the thoracolumbar spine not greater than 120 degrees; or when muscle spasm or guarding is severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. A 40 percent evaluation requires either that forward flexion of the thoracolumbar spine is limited to 30 degrees or less, or that favorable ankylosis of the entire thoracolumbar spine is shown.

For VA compensation purposes, normal forward flexion of the thoracolumbar spine is 0 to 90 degrees, extension is 0 to 30 degrees, left and right lateral flexion are 0 to 30 degrees, and left and right lateral rotation are 0 to 30 degrees. 38 C.F.R. § 4.71a, Note 2.

The Board must also consider functional loss due to pain or due to weakness, fatigability, incoordination, or pain on movement of a joint under 38 C.F.R. §§ 4.40 and 4.45 when deciding whether a higher disability evaluation is warranted. See also DeLuca v. Brown, 8 Vet. App. 202 (1995). Functional loss contemplates the inability of the body to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance, and must be manifested by adequate evidence of disabling pathology, especially when it is due to pain. 38 C.F.R. § 4.40. A part that becomes painful on use must be regarded as seriously disabled. Id.; see also DeLuca. 

The Veteran underwent an orthopedic examination in June 1999. The Veteran was found to have forward flexion to 93 degrees, with pain beginning at 31 degrees. On repetitive use he demonstrated flexion to 70 degrees. His extension was measured to 25 degrees, with pain at the end point, and measured to 20 degrees after repetitive use. He had no incoordination, abnormal movements, or instability on forward flexion or extension. His right and left lateral flexion was measured at 20 and 21 degrees respectively, with pain beginning at 17 and 19 degrees, and no additional loss on repetitive use. His right and left rotation were measured to 25 degrees with no pain or additional loss on repetitive use. The examiner diagnosed recurrent back pain with predominately moderate limitation of motion due to slight posttraumatic residuals, old fracture at T-12, with early spondylosis. He was also noted to have multiple intervertebral disc disease with early osteoarthritis spurring along the lumbar spine. 

The Veteran underwent a VA examination in May 2009. He reported weekly flare-ups lasting one to two weeks. No incapacitating episodes were noted. The Veteran's posture and gait were normal with no abnormal spinal curvatures. He was noted to have spasm, pain with motion, tenderness, and weakness in the thoracic spine. His flexion was measured to 60 degrees, extension to 14 degrees, and right and left lateral flexion and rotation all to 25 degrees with objective evidence of pain on motion. There was no additional limitation after repetitive-use testing. X-rays showed mild to moderate osteoporosis and mild to moderate spondylosis.

The Veteran underwent a VA examination in June 2010. His posture and gait were normal with no abnormal spinal curvatures. He was noted to have pain with motion and tenderness in his thoracolumbar spine. On range of motion testing of his thoracolumbar spine his flexion was measured to 65 degrees, extension to 20 degrees, right and left lateral flexion to 20 degrees, and right and left lateral rotation to 15 degrees. Pain was noted but no additional limitation on repetitive use. X-rays showed mild s-shaped scoliosis in the thoracic spine. A less than 10 percent loss of height due to the T12 vertebral fracture was noted. The examiner diagnosed residuals from the T12 compression fracture and unrelatedly, lumbar spondylosis and radiculopathy.

In February 2011 the Veteran underwent a general medical VA examination. On range of motion testing of his thoracolumbar spine his flexion was measured to 70 degrees, extension to 75 degrees, and right and left lateral rotation and flexion to 25 degrees. Pain on flexion was noted to start and end at 70 degrees with no change after three repetitions.

The Veteran was afforded another VA examination in April 2013. On range of motion testing of his thoracolumbar spine his flexion was measured to 80 degrees; his extension and right lateral flexion and rotation to 20 degrees, and left lateral flexion and rotation to 30 degrees or greater. Pain was noted at the end points of each range of motion. There was no change in range of motion on repetitive use testing, although less movement than usual and pain on movement was noted. The Veteran was noted to have intervertebral disc syndrome (IVDS), but not to have had any incapacitating episodes due to IVDS over the past 12 months. The examiner noted that the Veteran was unable to sit or stand for more than 30 minutes.

An August 2013 VA treatment record notes the Veteran's lumbar spine range of motion decreased by 30 percent in all spheres with low back pain.

The Board finds that the Veteran is not entitled to a greater than 20 percent rating under the criteria effective when he filed his claim or the current criteria. The Veteran's flexion has never been measured to be less than 60 degrees, and most testing shows a higher degree of range of motion. The Veteran has reported pain, but the evidence does not show it causes additional loss of functionality such that a higher rating is warranted. The Board notes that pain alone is not sufficient to warrant a higher rating, as pain may cause a functional loss, but pain itself does not constitute functional loss. Mitchell v. Shinseki, 25 Vet. App. 32, 36-38 (2011). Rather, pain must affect some aspect of "the normal working movements of the body" such as "excursion, strength, speed, coordination, and endurance," in order to constitute functional loss. Id. at 43; see 38 C.F.R. § 4.40. 

The Board has specifically considered the June 1999 examination that found the Veteran had pain beginning at 31 degrees forward flexion, which the examination report noted would correlate to severe limitation of forward bending. However, despite that pain the Veteran was able to flex to 93 degree degrees, which is normal forward flexion. He was also able to perform repetitive use testing, and still able to flex to 70 degrees after repetitive use, representative of moderate limitation of motion. The Board acknowledges the Veteran's pain, but finds that the limitations caused by that pain are adequately contemplated by the 20 percent rating assigned. The Board further notes that the Veteran's limitation of right and left flexion was no more than moderate, even considering his pain, and his rotation was nearly normal with no pain.

Overall, even considering the DeLuca factors, the Board finds that the Veteran's condition can neither be described as "severe limitation of motion" nor does it meet the current criteria for a 40 percent rating of flexion being limited to 30 degrees or less or favorable ankylosis of the entire thoracolumbar spine.

Diseases and injuries of the spine may also be rated under the criteria for intervertebral disc syndrome (IVDS), if applicable. Prior to September 23, 2002, a 40 percent rating was warranted for severe intervertebral disc syndrome with recurring attacks, with intermittent relief. A 60 percent rating was warranted for pronounced intervertebral disc syndrome with persistent symptoms compatible with sciatic neuropathy with characteristic pain and demonstrable muscle spasm, absent ankle jerk, or other neurological findings appropriate to site of diseased disc, and little intermittent relief. 38 C.F.R. § 4.71a, Diagnostic Code 5293 (2002).

Effective September 23, 2002, the rating criteria for intervertebral disc syndrome were amended to evaluate the disorder either on the total duration of incapacitating episodes resulting from intervertebral disc syndrome over the past 12 months, or by combining under 38 C.F.R. § 4.25 separate evaluations of its chronic orthopedic and neurologic manifestations along with evaluations for all other disabilities, whichever method results in the higher evaluation. A rating of 40 percent is warranted for intervertebral disc syndrome with incapacitating episodes having a total duration of least four weeks but less than six weeks during the past 12 months. A rating of 60 percent is warranted for intervertebral disc syndrome with incapacitating episodes having a total duration of at least six weeks during the past 12 months. An incapacitating episode is defined as a period of acute signs and symptoms due to intervertebral disc syndrome requiring bed rest and treatment "prescribed by a physician." Id. This regulation was again slightly revised in September 2003.

The evidence does not show that the Veteran has ever had severe intervertebral disc syndrome with recurring attacks, and he is noted not to have had any incapacitating episodes due to IVDS at his April 2013 VA examination. Therefore, a higher rating is not warranted under the criteria for IVDS.

Based on the forgoing, the Board finds that a preponderance of the evidence is against a rating in excess of 20 percent for the Veteran's degenerative disc disease of the lumbar spine. Therefore, the benefit of the doubt doctrine does not apply, and the claim must be denied.

With respect to associated neurological manifestations, the Board notes that the Veteran is service-connected for radiculopathy of his lower extremities and those ratings are not on appeal.

Cervical Spine

The Veteran currently has a 20 percent rating under Diagnostic Code 5293-5290 for cervical disc disease with headaches.

Under the rating criteria in effect prior to September 26, 2003, limitation of motion of the cervical spine was evaluated under Diagnostic Code 5290, which provided for the assignment of a 10 percent rating for slight limitation of motion, a 20 percent rating for moderate limitation of motion, and a 30 percent rating for severe limitation of motion. 38 C.F.R. § 4.71a, Diagnostic Code 5290 (2003). The terms "slight", "moderate," and "severe" are not defined in the rating schedule; rather than applying a mechanical formula, VA must evaluate all the evidence to the end that its decisions are "equitable and just." 38 C.F.R. § 4.6 (2013). Unfavorable ankylosis of the cervical spine warranted a 40 percent rating and favorable ankylosis warranted a 30 percent rating. 38 C.F.R. § 4.71a, Diagnostic Code 5287 (2003).

Pertinent to the cervical spine, the September 2003 regulation revisions to the General Rating Formula for Diseases and Injuries of the Spine provides for assignment of a 20 percent rating when forward flexion of the cervical spine is greater than 15 degrees but not greater than 30 degrees; or, the combined range of motion of the cervical spine is not greater than 170 degrees; or, there is muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis. A 30 percent rating is warranted for forward flexion of the cervical spine 15 degrees or less; or, favorable ankylosis of the entire cervical spine. Finally, the maximum 40 percent rating for cervical spine disability is only assignable for unfavorable ankylosis of the entire cervical spine. 38 C.F.R. § 4.71a (2013).

For VA compensation purposes, normal forward flexion of the cervical spine is zero to 45 degrees, extension is zero to 45 degrees, left and right lateral flexion are zero to 45 degrees, and left and right lateral rotation are zero to 80 degrees. The normal combined range of motion of the cervical spine is 340 degrees. Id.

The Veteran underwent an orthopedic examination in June 1999. The Veteran's forward flexion and extension of his cervical spine was noted to be within normal limits with pain beginning at 38 degrees forward flexion and 40 degrees extension. On repetitive use his forward flexion was measured to 26 degrees and extension to 30 degrees. Right lateral flexion was measured to 25 degrees with pain beginning at 20 degrees. Left lateral flexion was measured to 16 degrees with pain beginning at 12 degrees. After repetitive motion to the left the Veteran was noted to hardly be able to move his head. Left and right rotation was within normal limits, including after repetitive use, although the Veteran did have pain with maximum rotation to the left. The examiner diagnosed chronic neck pain with headaches and predominately moderate limitation of motion due to hereditary neuropathy pressure palsy C6-7 with radiculopathy C7, left greater than right, and bulging discs at C3-4, C4-5, and C5-6.

On private neurology examination the following day, the Veteran reported pain in his neck that radiates to his head and causes a migraine twice a week for which he takes Aspirin. He also reported severe headaches at night that sometimes disturb his sleep. Rotation of the head was noted to be somewhat restricted in both directions due to pain.

A March 2007 VA cervical spine x-ray showed straightening of the normal lordosis, suggestion of muscle spasm, mild degenerative disc disease, severe arthritic changes of the facet joint, and narrowed pedicular spaces of almost all the cervical spine with spinal stenosis to be excluded.

In VA examination in June 2010 the Veteran continued to report cervical spine pain and headaches. He was noted to have pain with motion and tenderness in his cervical spine. Range of motion in his cervical spine was measured to 45 degrees flexion, 35 degrees extension, 30 degrees left lateral flexion, 45 right lateral flexion, and 75 degrees right and left lateral rotation. There was pain on motion but no additional limitation after repetition.

On VA examination in February 2011 the Veteran's cervical flexion was measured to 45 degrees, his extension to 35 degrees, right and left lateral flexion to 40 degrees, and right and left lateral rotation to 75 degrees. Pain on extension was noted to start and end at 35 degrees with no change on repetitive use testing.

An October 2012 VA treatment record states that the Veteran has occasional headaches and neck pain with some difficulty sleeping. He also reported some dizziness with headaches.

On examination in April 2013 the Veteran's cervical flexion and extension were measured to 40 degrees. His right lateral flexion was measured to 45 degrees or greater, his left lateral flexion to 40 degrees, his right lateral rotation to 80 degrees, and his left lateral rotation to 70 degrees. Pain was noted to begin at the end points of each range of motion. There was no change on repetition. He did have less movement than usual and pain on movement. 

An August 2013 VA treatment record notes the Veteran's cervical spine range of motion decreased by 40 percent.

The Veteran testified at his Board hearing that he has headaches and gets dizzy. He reported he has pain in his neck and often gets headaches when he sleeps.

The Veteran's most significant range of motion limitations of his cervical spine were found in his June 1999 orthopedic examination. As the examination applies to the period prior to September 2003, the Board must decide whether it, and the other available evidence, suggests that the Veteran's condition at that point most closely approximated "severe" limitation of motion rather than "moderate" limitation of motion. As ankylosis is not shown, a rating under Diagnostic Code 5287 would not be applicable.

The Board acknowledges the Veteran's significant loss of range of motion, particularly with repetitive left lateral rotation. However, the Board also notes the Veteran's normal range of motion in right and left rotation, even after repetitive use. Further, the Board notes his normal forward flexion and extension prior to repetitive use, and at most moderate limitation of motion after repetitive use. Even considering the additional loss of range of motion on repetitive use in all ranges, the Veteran's combined range of motion of his cervical spine is 186 degrees. Without repetitive use, but considering the point at which pain begins, it is 240 degrees. Thus, the Board finds that overall the Veteran's condition most closely approximates a moderate limitation of motion.

The Veteran is further not entitled to a rating in excess of 20 percent under the revised regulations. In fact, the Veteran's condition seems to have improved since the 1999 examination.

The Veteran's cervical flexion has consistently been measured to between 40 and 45 degrees since 2010. In fact, with respect to loss of range of motion, in his substantive appeal, the Veteran explained that his primary problem is that he experiences tremendous pain and headaches on turning his head to the left. However, on objective testing even his left lateral rotation has consistently been measured to between 70 and 75 degrees. The Board acknowledges the Veteran's reports of pain, but puts significant weight in the objective range of motion testing, which has been consistent over many years. The Board further notes that the testing has considered the Veteran's limitations due to pain and on repetitive use, but additional range of motion limitations have not been found due to those factors on any VA examinations since 2010. 

Therefore, even considering the DeLuca factors, the Board finds that the Veteran's condition can neither be described as "severe limitation of motion" nor does it meet the current criteria for a 30 percent rating of flexion being limited to 15 degrees or less or favorable ankylosis of the entire cervical spine.

The evidence does not show that the Veteran has ever had severe intervertebral disc syndrome with recurring attacks, and the evidence does not show he has had any incapacitating episodes due to IVDS. Therefore, a higher rating is not warranted under the criteria for IVDS.

Based on the forgoing, the Board finds that a preponderance of the evidence is against a rating in excess of 20 percent for the Veteran's cervical disc disease. Therefore, the benefit of the doubt doctrine does not apply, and the claim must be denied.

The Board has also considered whether referral for consideration of an extraschedular rating is warranted for either the Veteran's cervical or lumbar spine disabilities, but finds that it is not. 38 C.F.R. § 3.321(b)(1). The determination of whether a claimant is entitled to an extraschedular rating under § 3.321(b) is a three-step inquiry. Thun v. Peake, 22 Vet. App. 111 (2008). 

The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. This means that initially there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. If the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is adequate, and no referral is required. 

In this case, the medical evidence fails to show anything unique or unusual about the Veteran's service-connected spine disabilities that would render the schedular criteria inadequate. The Veteran's symptoms, including pain and loss of range of motion, are contemplated in the rating assigned. The Board notes that the Veteran's cervical spine disability is associated with headaches, which is not contemplated in the rating criteria for spinal disabilities. As discussed below, the Board finds that an examination is necessary to determine if a separate rating is warranted for those headaches. As the Veteran's other symptoms are considered by the rating criteria assigned, it would not be found that his disabilities meet the "governing norms" of an extraschedular rating. Accordingly, referral for consideration of an extraschedular rating is not warranted. Moreover, even if it were argued that the schedular rating criteria were inadequate, the Board finds no reason to refer the case to the Compensation and Pension Service to consider whether an extra-schedular rating is warranted. In this case, the evidence does not show hospitalization due to the Veteran's spinal disabilities during the period on appeal. In addition, the Board finds the record does not reflect that the Veteran's spinal disabilities markedly interfere with his ability to work, beyond what is contemplated by the rating criteria. See 38 C.F.R. § 4.1 (indicating that generally, the degrees of disability specified in the Rating Schedule are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability). 

The manifestations of the Veteran's disabilities are considered by the schedular rating. Based on the foregoing, the Board finds the schedular evaluation is adequate, and referral is not required. 38 C.F.R. § 3.321; Thun v. Peake, 22 Vet. App. 111 (2008). 

PTSD and Phobic Reaction to Flying

The Veteran is service-connected for phobic reaction to flying, rated as noncompensable prior to May 22, 2009 under the General Formula for Mental Disorders. See 38 C.F.R. § 4.130. From May 22, 2009 to April 17, 2013 the Veteran is rated at 50 percent for phobic reaction to flying with posttraumatic stress disorder (PTSD). He is rated at 70 percent effective April 17, 2013.

Under the General Formula for Mental Disorders, a noncompensable rating is warranted for a mental condition that has been formally diagnosed but the symptoms are not severe enough either to interfere with occupational and social functioning or to require continuous medication. See 38 C.F.R. § 4.130. 

A 10 percent rating is assigned where there is occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication. Id.

A 30 percent rating is assigned where there is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, mild memory loss (such as forgetting names, directions, recent events). Id. 

A 50 percent rating contemplates occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short-and long-term memory; impaired judgment; impaired abstract thinking; disturbance of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Id. 

A 70 percent evaluation is warranted where there is occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; intermittently illogical obscure, or irrelevant speech; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); and inability to establish and maintain effective relationships. Id. 

A 100 percent evaluation is warranted where there is total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; and memory loss for names of close relatives, own occupation, or own name. Id. 

Symptoms listed in VA's general rating formula for mental disorders are not intended to constitute an exhaustive list, but rather are to serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. Mauerhan v. Principi, 16 Vet. App. 436 (2002). 

The nomenclature employed in the portion of VA's Rating Schedule that addresses service-connected psychiatric disabilities is based upon the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, of the American Psychiatric Association (also known as "DSM-IV"). 38 C.F.R. § 4.130. DSM-IV contains a Global Assessment of Functioning (GAF) scale, with scores ranging between zero and 100 percent, representing the psychological, social, and occupational functioning of an individual on a hypothetical continuum of mental health illness. Higher scores correspond to better functioning of the individual. 

Under DSM-IV, GAF scores ranging between 51 and 60 are assigned when there are moderate symptoms (like flat affect and circumstantial speech, and occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). 

GAF scores ranging between 41 and 50 are assigned when there are serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). 

According to the applicable rating criteria, when evaluating a mental disorder, the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the veteran's capacity for adjustment during periods of remission must be considered. 38 C.F.R. § 4.126(a). In addition, the evaluation must be based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. Id. Further, when evaluating the level of disability from a mental disorder, the extent of social impairment is considered, but the rating cannot be assigned solely the basis of social impairment. 38 C.F.R. § 4.126(b). 

Prior to May 22, 2009 

The Board finds that the Veteran's condition prior to May 22, 2009 warrants a 10 percent rating. Although there is limited medical evidence as to the Veteran's psychological condition during that time, the Board finds that the symptoms he reported at his June 1999 evaluation in particular suggests he experienced occupational and social impairment due to mild or transient symptoms which decreased work efficiency and ability to perform occupational tasks only during periods of significant stress, meeting the criteria for a 10 percent rating.

Specifically, the Veteran reported at his June 1999 VA examination that he had been experiencing social phobia in which he was unable to go shopping in supermarkets and to be in confined spaces, although he did report a regression in that problem in the past year. The Veteran further reported episodes of severe depression.

A December 2008 private treatment records also reflects that the Veteran reported depression and anxiety and that he had been prescribed anti-depressant medication, although he wasn't taking it on a regular basis.

A March 2009 private treatment record notes that the Veteran has had panic attacks.

Therefore, the Board finds that giving the Veteran the benefit of the doubt, he should be awarded a 10 percent rating. However, the Board finds that a rating in excess of 10 percent is not warranted. For a 30 percent rating the Veteran's condition would need to result in is occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks. The Board finds that the evidence does not support that the Veteran's condition more closely approximated those criteria.

Specifically, the June 1999 VA examiner noted that the Veteran was fully oriented, had good rapport, no indications of aggressive tendencies, no paranoid thought patterns, no hallucinations, and no suicidal or homicidal ideation. Further, the evidence does not suggest the Veteran experienced any symptoms other than some social phobia, panic attacks, anxiety, and depression. 

While the Veteran's symptoms would no doubt increase if faced with flying, the Board's consideration is focused primarily on how his psychological condition affected his general occupational and social functioning. It is only by giving the Veteran the benefit of the doubt that the Board finds he is entitled to a 10 percent rating. A preponderance of the evidence is against a rating any higher.

May 22, 2009 to April 17, 2013

In 2009 the Veteran began seeking treatment at the VA, and that evidence, as well as the VA examinations conducted beginning in May 2009, supports that the Veteran's condition, warrants a higher rating. The Veteran is currently assigned a 50 percent rating from May 22, 2009 to April 17, 2013. The Board finds that the assigned rating is appropriate and an increased rating above 50 percent is not warranted.

The Veteran was afforded a VA examination May 22, 2009 at which he was diagnosed with a phobia disorder and panic disorder. He reported he was separated from his wife and living with his sister, with whom he has a fair relationship. He reported he recently moved back to the United States from Germany and had no friends. He said he liked to restore old cars. He reported panic attacks in close places such as an elevator and if he sleeps on his back because he chokes a little. He said he also gets panic attacks sometimes in a crowd. The examiner noted the Veteran's speech and psychomotor activity were unremarkable, he was cooperative, had a restricted affect, was easily distracted, was oriented, had unremarkable thought process and content, and understands the outcome of his behavior and that he has a problem. The Veteran reported being afraid to sleep as he has dreams of flying. No suicidal or homicidal ideation. His immediate memory was mildly impaired but remote and recent memory normal. The examiner assigned a GAF of 50.

At a June 2009 VA treatment psychiatry consultation the Veteran was diagnosed with a panic disorder with a phobia to flying and assigned a GAF of 60. In August he reported continued panic attacks. In October he was seen for anxiety and insomnia and a PTSD diagnosis is noted. In November he was noted to report symptoms consistent with moderate PTSD. At a VA psychiatry appointment in December 2009 the Veteran was diagnosed with PTSD. He reported anxiety, difficulty sleeping, and nightmares. He was assigned a GAF of 55. He began attending a PTSD coping skills group and continued to be assessed with a GAF of 55. A March 2010 VA treatment note reflects that the Veteran continued to report insomnia, anxiety, mild depression, and avoidance behavior. He was assigned a GAF of 55. At the final PTSD group meeting in May 2010 the Veteran was assigned a GAF of 60.

The Veteran underwent another VA examination in July 2010. He reported panic episodes one to three times per week lasting five to ten minutes and occurring both while asleep and awake. He reported he divorced in 2009 after seven years of marriage. He said he has no close friends. He fixes his car as a hobby. The examiner found his psychomotor activity and speech to be unremarkable, his attitude cooperative, affect normal, attention intact, thought process and content unremarkable. He was oriented and the examiner stated that he understands the outcome of his behavior and that he has a problem. The Veteran described his mood as "not so happy." He was noted to have good impulse control and no suicidal or homicidal ideation. The Veteran reported that sometimes he forgets what he is in the middle of doing. He reported he is irritable, anxious, has a dysphoric mood, panic attacks, poor sleep, nightmares, intrusive thoughts, flashbacks, and a distrust of others. The examiner assigned a GAF of 55. The examiner found the Veteran's symptoms cause reduced reliability and productivity.

In February 2012 the Veteran underwent another VA examination. The examiner opined that the Veteran's psychiatric disability causes occupational and social impairment with reduced reliability and productivity. The Veteran reported being in an up and down relationship with his girlfriend for the past year. He said he has a difficult relationship with sister, with whom he lives. He reported no close friends; the examiner noted he had only been living in Florida for two years. The Veteran said he works on his car and goes out with his girlfriend. The examiner found the following symptoms: anxiety, suspiciousness, chronic sleep impairment, mild memory loss, difficulty establishing and maintaining effective work and social relationships. The Veteran says he's depressed a little three times per week because he can't do things he wants, including flying in an airplane and has anxiety attacks in closed places. The examiner assigned a GAF of 55.

With the exception of the GAF score of 50 assigned by the May 2009 VA examiner, the Veteran has consistently been assigned GAF scores of 55 or 60, both by his treating medical providers and subsequent VA examiners. GAF scores ranging between 51 and 60 are assigned when there are moderate symptoms or moderate difficulty in social, occupational, or school functioning. Thus, the Veteran's GAF scores overall support a 50 percent rating.

Also, both the July 2010 and February 2012 VA examiners specifically opined that the Veteran's symptoms cause reduced reliability and productivity, the criteria for a 50 percent rating.

Further, the Board finds that the Veteran's symptoms, as he himself has reported them, do not support a rating above 50 percent. 

The Veteran has described his anxiety and panic attacks as occurring primarily when in crowds or small spaces or when he feels like he's choking when he's sleeping. In July 2010 he reported the panic episodes occur one to three times per week lasting five to ten minutes. He has also described his depression as more episodic than constant. For example, in February 2012 he told the VA examiner he was depressed a little three times a week because he can't do things that he wants such as fly in an airplane.

The evidence also does not suggest that the Veteran has an inability to establish and maintain effective relationships, but rather a difficulty, which supports a 50 percent rather than a 70 percent rating. Although he got divorced in 2009, he began dating a woman in 2010 who he maintained a relationship with at least through 2013. He also maintained some relationship with his sister, with whom he lived, although he described it as "fair" in 2009 and "difficult" in 2012. He consistently reported not having any close friends, although examiners noted he just moved to Florida from overseas in 2009.

Further, the Veteran, for example only, has not reported or been found to have suicidal ideation; obsessional rituals which interfere with routine activities; intermittently illogical obscure, or irrelevant speech; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; or neglect of personal appearance and hygiene.

Overall, the Board finds that the Veteran's condition does not more closely approximate the criteria for a 70 percent rating. The Board acknowledges the Veteran's symptoms, including panic attacks, depression, and nightmares, but finds that they are contemplated by the 50 percent rating assigned.

As of April 17, 2013 

The Veteran has been awarded a 70 percent rating effective April 17, 2013, the date of his last VA examination.

The April 2013 VA examiner opined that the Veteran's symptoms cause him occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although general functioning satisfactorily.

The Veteran reported he is living with his girlfriend of three years although the relationship is not good as she does not understand his condition. He reported a good relationship with one sister but no communication with the other. He reported no close friends. He said he works on his car and goes out with his girlfriend. He reported a fear of being in crowded places.

The Veteran reported poor sleep, depressed mood, irritability, occasional nightmares, and being too alert. The examiner found the Veteran to be alert and oriented, calm and cooperative with good eye contact, normal speech, grossly intact cognitive function, adequate attention and concentration, with no psychomotor agitation or retardation. The Veteran described his mood as "down" and the examiner noted congruent affect. The examiner further noted normal thought process and content, good insight and judgment, and no suicidal or homicidal ideation. The examiner noted the following symptoms: depressed mood, anxiety, suspiciousness, chronic sleep impairment, disturbances of motivation and mood, and difficulty in adapting to stressful circumstances. The examiner assigned a GAF of 60.

The Veteran was also assigned a GAF of 60 in August 2013, according to a VA treatment record. At the appointment the Veteran reported depression and anxiety. He also reported mild panic attacks.

At his August 2013 Board hearing the Veteran testified he has panic attacks every night. He also reported difficulty being in enclosed or elevated spaces. He said he can sometimes tolerate an elevator but most of the time does not trust them. He said he also has panic attacks when he's around a large number of people and if he is in a situation where he has to turn his back on people. He said he has a few friends.

The Board finds that the Veteran is not entitled to a rating in excess above 70 percent. A 100 percent evaluation is warranted only for total occupational and social impairment and the evidence does not show the Veteran's condition is of that severity. 

In fact, the assigned GAF scores of 60 represent only moderate symptoms or moderate difficulty in social, occupational, or school functioning. Further, the VA examiner opined that the Veteran has occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although general functioning satisfactorily.

The Veteran himself has not described symptoms that approximate a 100 percent rating. At his VA examination the Veteran described his mood as "down." An August 2013 VA treatment note described his panic attacks as "mild." He has been in a three-year relationship with his girlfriend, has a good relationship with a sister, and testified to the Board that he has a few friends.

The Board further notes that VA examiner found the Veteran to be alert and oriented, calm and cooperative with good eye contact, normal speech, grossly intact cognitive function, adequate attention and concentration, with no psychomotor agitation or retardation, normal thought process and content, good insight and judgment, and no suicidal or homicidal ideation. 

Based on the forgoing, the Board finds a preponderance of the evidence is against both a rating in excess of 50 percent from May 22, 2009 to April 17, 2013 and in excess of 70 percent thereafter. 

The Board has also considered whether referral for consideration of an extraschedular rating is warranted but finds that it is not. The medical evidence fails to show anything unique or unusual about the Veteran's service-connected PTSD that would render the schedular criteria inadequate. The Veteran's symptoms, including panic attacks, depression, anxiety, and nightmares are contemplated in the rating assigned. Accordingly, referral for consideration of an extraschedular rating is not warranted. Moreover, even if it were argued that the schedular rating criteria were inadequate, the Board finds no reason to refer the case to the Compensation and Pension Service to consider whether an extra-schedular rating is warranted. In this case, the evidence does not show hospitalization due to the Veteran's PTSD during the period on appeal. In addition, the Board finds the record does not reflect that the Veteran's PTSD markedly interferes with his ability to work, beyond what is contemplated by the rating criteria. See 38 C.F.R. § 4.1.

The manifestations of the Veteran's disability are considered by the schedular rating. Based on the foregoing, the Board finds the schedular evaluation is adequate, and referral is not required. 38 C.F.R. § 3.321; Thun v. Peake, 22 Vet. App. 111 (2008). 

Duties to Notify and Assist

VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. A notice letter was sent to the Veteran's updated address in December 2009, in compliance with the Board's October 2009 remand. Where VCAA notice is provided after the initial decision, such a timing error can be cured by subsequent readjudication of the claim, as in a Statement of the Case (SOC) or Supplemental SOC (SSOC). Mayfield v. Nicholson, 20 Vet. App. 537, 543 (2006). Multiple SSOCs have been issued subsequent to the compliant VCAA notice, therefore, the Board finds that the timing error has been cured in this case. 

Further, the VCAA letter informed the Veteran of what information and evidence must be submitted to substantiate the claim, including a description of what information and evidence must be provided by the Veteran and what information and evidence would be obtained by VA. He was also advised to inform VA of any additional information or evidence that VA should have, and to submit evidence in support of the claim to the RO. The letter also addressed VA's practices in assigning disability evaluations and effective dates for those evaluations. See Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). Therefore, the Board finds that the content of the letter complied with the requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b). 

VA also has a duty to assist the Veteran with the development of facts pertinent to the appeal. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159(c). This duty includes the obtaining of "relevant" records in the custody of a federal department or agency under 38 C.F.R. § 3.159(c)(2), as well as records not in federal custody (e.g., private medical records) under 38 C.F.R. § 3.159(c)(1). VA will also provide a medical examination if such examination is determined to be "necessary" to decide the claim. 38 C.F.R. § 3.159(c)(4).

The Board finds that all necessary development has been accomplished. The RO has obtained the Veteran's VA treatment records and private treatment records identified by the Veteran. Neither the Veteran nor his representative has identified, and the record does not otherwise indicate, any additional existing evidence that is necessary for a fair adjudication of the claim that has not been obtained. 

The Veteran was afforded VA medical examinations in relevant to his spine claims in June 1999, May 2009, June 2010, February 2011, and April 2013. He was afforded VA mental health examinations in June 1999, May 2009, July 2010, and February 2012. The examiners, medical professionals, obtained an accurate history, listened to the Veteran's assertions, and performed the necessary tests. The examiners provided the Board with sufficient information to rate the Veteran's disabilities. Therefore, the Board finds that the examination is adequate and contains sufficient information to decide the issues on appeal. Barr v. Nicholson, 21 Vet. App. 303, 311 (2007).

Hence, no further notice or assistance to the Veteran is required to fulfill VA's duty to assist in the development of the claim. Smith v. Gober, 14 Vet. App. 227 (2000), aff'd 281 F.3d 1384 (Fed. Cir. 2002); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); see also Quartuccio, 16 Vet. App. 183 (2002).


ORDER

An increased rating in excess of 10 percent for degenerative disc disease of the lumbar spine is denied.

An initial evaluation in excess of 20 percent for cervical disc disease with headaches is denied.

A rating of 10 percent, but no higher, for phobic reaction to flying prior to May 22, 
2009 is granted.

A rating in excess of 50 percent from May 22, 2009 to April 17, 2013 and in excess of 70 percent thereafter for phobic reaction to flying with posttraumatic stress disorder (PTSD) is denied.


REMAND

The Board finds a remand is necessary with respect to the issues of entitlement to an initial compensable rating for left ear hearing loss, a separate compensable rating for headaches associated with service-connected cervical disc disease, and TIDU.


Hearing

In January 2014 the Board remanded the Veteran's claim for an initial compensable evaluation for hearing loss in the left ear further development, to include obtaining a copy of the audiometric test results from the testing at the VA in November 2012. 

A review of the file does not show that the audiological testing results have been obtained and associated with the Veteran's claims file, as required by the Board's remand. 

Where the RO does not comply with a remand by the Board, the Board errs as a matter of law when it fails to ensure compliance. See Stegall v. West, 11 Vet. App. 268 (1998). Therefore, the Board finds that a remand is necessary to obtain the November 2012 audiological testing results and associate them with the file. 

The Board further notes that new VA treatment records associated with the Veteran's file since the last Board remand indicate that another audiometric test was conducted in February 2013. Specifically, a June 2013 VA treatment note indicates the Veteran was present for a follow-up to a February 14, 2013 audiogram. Results from that audiological testing are also not associated with the Veteran's file.

Thus, on remand, the AOJ must obtain the audiological test results from testing conducted at the VA in November 2012 and February 2013. 

Headaches

The Veteran has throughout the course of his appeal complained of headaches, which have been related to his cervical disc disease. However, the Board finds there is not sufficient information to determine whether the Veteran is entitled to a separate compensable rating for his headaches.

Therefore, the Board finds that the Veteran should be afforded with a VA headaches examination to determine the current nature and severity of his headaches. The examiner should also attempt to clarify the nature and severity of the Veteran's headaches since his claim was filed in October 1997.

TDIU

The law provides that TDIU may be granted upon a showing that a Veteran is unable to secure or follow a substantially gainful occupation due solely to impairment resulting from his service-connected disabilities. See 38 U.S.C.A. 
§ 1155 (West 2002); 38 C.F.R. §§ 3.340, 3.341, 4.16 (2013). 

The Board has previously referred the Veteran's claim for TDIU. In a May 2013 rating decision, the RO stated that the Veteran's claim for TDIU would be addressed after the appealed issues had been resolved. In May 2014, the Veteran submitted another letter contending he is entitled to TDIU. As the issue has not been adjudicated by the RO and is inextricably intertwined with the issues being remanded, the Veteran's claim of entitlement to TDIU is remanded for contemporaneous adjudication.

Accordingly, the case is REMANDED for the following action:

1. Obtain the audiological testing data from the Veteran's audiological examination conducted by the VA in November 2012 and February 2013.

2. Arrange for the Veteran to undergo a VA headaches examination. In addition to describing the current nature and severity of the Veteran's headaches, as well as whether they cause prostrating attacks, the examiner should attempt to clarify the nature and severity of the Veteran's headaches since his claim was filed in October 1997.

3. Thereafter, readjudicate the Veteran's pending claim in light of any additional evidence added to the record. If the benefit sought on appeal remains denied, the Veteran and his representative should be furnished a supplemental statement of the case and given the opportunity to respond thereto. Thereafter, the case should be returned to the Board for appellate review.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West Supp. 2013).




______________________________________________
M. TENNER
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs